A. E. ALEXANDER, RECEIVER, Appellant, *v.* JAMES S. ROLLINS ET AL., Respondents.

### June 12, 1883.

1. NEGOTIABLE INSTRUMENTS — INSURANCE COMPANIES, POWERS OF. — Insurance companies have, in the general conduct of their business, the power to take, hold, and negotiate negotiable paper.
2. —— Stock notes of a mutual insurance company which are negotiable in form are negotiable in fact.
3. —— NOTICE — FRAUD. — A payment by the maker to the fraudulent holder of a negotiable note without notice of the fraud, discharges the maker from liability thereon to the payee.
4. AGENCY. — In the absence of evidence of express appointment, of ratification, or of an estoppel, there is no sufficient evidence of agency.
5. CORPORATIONS — STOCKHOLDERS — NEGOTIABLE INSTRUMENTS. — A stockholder who sells his stock to one who offers him, in part payment, the negotiable securities given by him to the corporation for the stock, is not bound to inquire as to how these securities were obtained.
6. —— NOTICE. — A stockholder who sells his stock is not, by reason of entries on the books of the corporation, which do not evidence fraud, affected with notice of a fraudulent conspiracy between the directors and the purchaser to wreck the corporation.

APPEAL from the St. Louis Circuit Court, THAYER, J. *Affirmed.*

W. L. SCOTT and E. McGINNIS, for the appellant: Stock notes of insurance companies are not negotiable. — *Stillwell* v. *Craig*, 58 Mo. 24; *Schultz* v. *Sutter*, 3 Mo. App. 137; 1 Wag. Stats., p. 744, sects. 19, 20. And the indorsement of them by the corporation would be a nullity. — *Strauss* v. *Eagle Ins. Co.*, 5 Ohio St. 65; Story on Bills, sect. 79; *Floyd's Acceptances*, 7 Wall. 666. If such stock notes are negotiable, they are so only under statutory limitations.— 1 Wag. Stats. p. 744, sects. 19, 20; *Attorney-General* v. *Life and Fire Ins. Co.*, 9 Paige, 474; *Smith* v. *Ale. Life Ins. Co.*, 4 Ala. 558; *New York Fire Ins. Co.* v. *Ely*, 2 Cow. 572; *Strauss* v. *Eagle Ins. Co.*, 5 Ohio St. 65. A stockholder stands affected with notice of the proceedings of the board of directors of his company as they appear in the public records of the company. — *Bedford R. Co.* v. *Bowser*, 48 Pa. St. 29; *Kitchen* v. *St. L., K. & N. R. Co.*, 69 Mo. 226, 265; Whart. on Ev., sects. 661, 662, 1131. Payment of negotiable paper before maturity is out of the due course of business, and the payer is not protected by such payment to one who has wrongfully acquired the paper. — 2 Ames on Bills and Notes, 823; Pars. on Notes and Bills, 212, 213; Chitty on Bills (11th ed.), 394 *a;* Story on Bills (7th ed.), sects. 417, 384, 386; *Morley* v. *Culverwell*, 7 Mees. & W. 174; *Kingman* v. *Partee*, 17 Mass. 274; *Eckert* v. *Conmure*, 43 Pa. St. 120; *Griswold* v. *Davis*, 31 Vt. 390; *Goden* v. *Bank, etc.*, 6 Duer, 82.

J. B. HEISKELL, for the appellant.

OVERALL & JUDSON, for the respondent: " Stock notes " are negotiable in the hands of the corporation payee. — *Protection Ins. Co.* v. *Bibb*, 31 Conn. 534; *Ogdensburg R. Co.* v. *Wooley*, 3 Abb. Dec. 398; *Magee* v. *Badger*, 30 Barb. 246; *Clark* v. *Litcomb*, 42 Barb. 122; *White* v. *Haight*, 16 N. Y. 310. " Unless expressly restrained by

law a corporation may deal with its property in the same manner as an individual in prosecuting its legitimate business." — Morawetz on Priv. Corp., sect. 164; *Spear* v. *Ladd*, 11 Mass. 95. In the total absence of proof of any wrongful combination between Rollins and Davis, or of any notice or ground of suspicion on part of Rollins, it is immaterial what was Davis' attitude to the company and it is unnecessary to discuss the several propositions of plaintiff with reference therto. — *Alexander* v. *Horner*, 9 Cent. L. J. 111.

BAKEWELL, J., delivered the opinion of the court.

This was a bill in equity against James S. Rollins, George J. Davis, and the superintendent of the insurance department of Missouri in charge of the assets of the Life Association of America, to avoid a transaction by which Rollins obtained possession of certain stock notes and bonds, part of the assets of the Columbia Life Insurance Company. Judgment is asked against Rollins for the amount of the notes, which were made by him, and that he be required to deliver up the bonds.

The petition alleges that Davis acquired these assets by fraud, and fraudulently transferred them to Rollins, in furtherance of a conspiracy between Davis, the Life Association, and A. M. Britton, of which Rollins had notice, to release the stockholders of the Columbia (once called the St. Louis Life Association), and to effect a merger of that company with the Life Association of America by means of a transfer of all the stock of the former to the latter company, which was then to reorganize, directors of the Life Association being first chosen directors of the Columbia for that purpose.

Before any answers were filed, plaintiff dismissed as to the Life Association. Davis filed a general denial. Rollins, after a general denial, sets up that he sold his stock to Davis in good faith, and received his stock notes in part

payment in good faith; that the St. Louis Life (afterwards Columbia), afterwards ratified this proceeding; that the receiver of the Columbia, with the full knowledge of all the facts, also ratified the transfer, and has placed it out of his power to rescind and place the parties in *statu quo;* that the stock of the Columbia was at par when Rollins sold, and is now worthless, etc.

On hearing, plaintiff's petition was dismissed. The matters in controversy have been repeatedly before this court in the progress of the complicated litigations growing out of these transactions. Especially the matters in evidence in this case were before this court in *Alexander* v. *Relfe* (9 Mo. App. 133), and in *Alexander* v. *Supe et al.* (11 Mo. App. 597). Besides a great deal of *viva voce* testimony, the whole record of this court and of the supreme court in *Alexander* v. *Relfe* (*supra*), was put in evidence on this trial. The testimony is, of course, very voluminous. The sum of it, so far as it is material for the purpose of this appeal, is as follows :—

The St. Louis Life Insurance Company was first called the Mound City Mutual Life Insurance Company ; it changed its name repeatedly. Its last name was the Columbia, and by that name, to avoid confusion, it will be called in this opinion.

It appears that defendant, Rollins, whose residence was throughout at Columbia, Missouri, subscribed, in December, 1873, for one hundred shares of the capital stock of the Columbia, of the par of $100. At the same time, Rollins borrowed of the Columbia $10,000, for which he delivered his two notes, one for $1,500 at one year, and the other for $8,500 at three years, and delivered as collateral, eleven Missouri State bonds of $1,000 each. Rollins paid for his stock with the money thus borrowed. The notes remained in the possession of the Columbia until December 10, 1875, and were unpaid, except as to $1,000 credited in April, 1875, on the $1,500 note.

On November 23, 1875, the Life Association of America entered into an agreement with defendant Davis to purchase from him nine thousand four hundred shares of the capital stock of the Columbia, and as many more shares as Davis could deliver within thirty days.   With the stock, Davis was to deliver stocks and securities owned by the Columbia, of which a list was attached to the contract. For the nine thousand four hundred shares and the securities, Davis was to receive $1,215,000, and for all other shares, he was to receive par.   Ninety per cent of this was to be paid to Davis by a draft of Hough, its president, on the Life Association, accepted by it at one day's sight.   The remainder was to be paid cash, on delivery of the stock and securities.   This agreement was made in pursuance of a resolution of the directors of the Life Association, of date November 13, 1875.   The assets to be transferred were largely stock notes and capital investment notes secured, as the insurance law required, by collaterals and real estate.   The Rollins notes were amongst them.   Davis, Britton, and Lomax were then directors of the Columbia; Lomax was its secretary ; Britton was its vice-president, acting as president ; Davis was the regular salaried attorney of the Columbia.   The company had a lien on the stock for any indebtedness due it by the stockholders. Davis was to deliver the stock free from lien.   Davis tendered his resignation as director on November 26th.   It was accepted four days afterwards.   Lomax and Britton retained their positions until the transactions were accomplished.   Having made the above contract with the Life Association and resigned as director of the Columbia, Davis made a proposition to the Columbia to buy of it the property mentioned in his contract with the Life Association, at the price he had proposed.   The minutes of the board of directors of the Columbia, show these proceedings on November 30, 1875.

Mr. Davis then submitted a list of securities belonging to

the company which he desired to purchase, the price being satisfactory, and for payment of which he would give the draft of H. W. Hough, president, on the Life Association to the order of Davis at one day's sight and accepted by said Life Association. After an examination of the list and full discussion thereof, the following resolution, offered by Mr. Bogy, was adopted : —

" *Resolved*, That the vice-president be authorized to sell and deliver to George J. Davis the following securities, or any one or all of said securities, at the price named in the list hereto appended, and that the vice-president be authorized to receive in payment for said securities, so sold and delivered, the draft of W. H. Hough, president, drawn at one day's sight to the order of George J. Davis and by him indorsed to the Life Association of America and by said Association accepted."

The list of securities mentioned in the contract, with prices aggregating $1,111,898.34, follows. The notes of Rollins are included, and they were afterwards duly indorsed by the Columbia and delivered to Davis. Davis complied with his contract, and received in payment, on December 10, 1875, from Britton, as acting president of the Columbia, the draft of the Life Association for $1,111,-898.34 to Davis' order. This draft Davis indorsed without recourse and delivered to the Columbia on December 10th, on which day the minutes of that company show that the president informed the board that Davis had tendered to him the draft as specified in the resolutions on the 30th, and that, in accordance with those resolutions, he had sold and delivered the securities. The directory of the Columbia then resigned, and the Life Association, holding all its stock, elected a directory composed of persons who had been directors of the Columbia. Besides the Rollins notes, there were, amongst the assets transferred, notes of the firm of which Davis was a member, of Lomax, and of Britton. These persons all got back their notes from Davis

in exchange for their stock, as did the other stockholders of the Columbia. As soon as Davis had possession of the assets of the Columbia, he set to work to buy its stock, returning to the stockholders the notes and collaterals they had given for the stock and any percentage they had paid in cash. Then Rollins received from Davis his notes and collaterals and $1,000 cash in exchange for his stock. As Davis was in St. Louis, and Rollins in Columbia, the negotiations were by letters. The letters were not produced, no copies having been kept. The result was as stated. The stock was worth, at the time, on the market fully what was paid for it. The Columbia stood high in public estimation. There is no evidence that the Life Association of America was not quite solvent when it gave its draft to Davis, or that they could not pay the draft. But, shortly afterwards, the Columbia, by a two-thirds vote of its directory, was authorized to reduce its capital stock from ten thousand shares of the par value of $100 to any amount not less than $100,000. The directory then resolved on a reduction of nine thousand shares; to effect which, they set aside $900,000 alleged surplus, and bought that number of shares at par from the Life Association, for which they paid by canceling that amount of the Davis draft. The remainder was paid in cash or its equivalent. The Life Association continued to be a live concern long after this. The Columbia was reputed solvent and doing a profitable business in December, 1875. Its character was injured by subsequent litigation. It was dissolved by decree of court in October, 1878. Afterwards, plaintiff, as receiver of the Columbia, sued the Life Association for non-payment of the Davis draft, and got judgment for the amount unpaid, on which judgment he has collected something near $100,000. The Columbia in liquidation can not pay twenty-five cents on the dollar out of the assets so far collected. A large proportion of the claims against her are for liabilities existing on December 10, 1875.

The evidence that immediately after the delivery of the draft on December 10th, the Life Association controlled the Columbia, was rejected by the trial court, as were also offers of testimony to the effect that Davis was worth only $5,000 when he indorsed the draft; that in many cases drafts drawn by him to the order of stockholders for their stock were delivered by him to Britton as agent of these stockholders, and that Britton, Lomax, Davis, and the Life Association managed that the draft was not to be paid, or protested.

In the record in the case of *Alexander* v. *Relfe* introduced in this case, there was evidence tending to show that the whole transaction between the two companies was in good faith and believed to be for the benefit of the Columbia; there was also evidence tending to show that it was a fraudulent plot on the part of Davis, Lomax, Britton, and others to appropriate and waste the assets of the Columbia. The circuit court, in the case just cited, found that the facts in evidence showed no fraudulent intent on the part of these men or the directory. The supreme court found that the transaction was a constructive fraud, at least, and that the acts of the two corporations which resulted in the cancellation and retirement of the capital stock, were unlawful. *Alexander* v. *Relfe*, 74 Mo. 495.

There is no evidence tending to show that defendant Rollins knew or suspected any fraud. There is nothing in the testimony, so far as we can see, that tends to throw any discredit upon the following very explicit declaration in his testimony in this case: —

" If any conspiracy or confederacy, as charged in the petition, existed between the St. Louis Life Association, George J. Davis, and A. M. Britton, or either of them, or any other parties, I never heard of it, suspected it, or knew anything about it. When I received my notes and bonds from George J. Davis in exchange for my stock, I supposed he had become the true and lawful owner, and as such that

he had the legal right to sell the same, and I did not know nor have any reasons to believe, that Mr. Davis had become the owner of my notes for any improper motives, or in any improper or illegal manner, or with any intent to wrong or injure the St. Louis Life Insurance Company, or its creditors, or stockholders, or that the company had thereby become weakened in any way, or the stockholders or creditors thereof become any less secure."

As to actual notice of any fraud, it is clear that defendant Rollins had none.

The attempt is, to hold Rollins on account of notice to Britton, who it is said, was the agent of Rollins in the matter of the sale of stock, and of the position of Rollins as a stockholder of the Columbia.

1. As to the first, we see no evidence to warrant a finding that Britton was the agent of Rollins in any such sense as to affect Rollins with notice of what Britton knew.

Rollins had known Britton slightly for many years; but he had no intimate acquaintance with him. Rollins positively swears that, to his knowledge, Britton never was his agent, for any purpose whatever; that he never, in any way, authorized Britton to act for him in the matter in controversy, and never saw, spoke, or wrote to Britton about the matter; that it may be possible that Britton forwarded to him the notes and collateral; but that, if this be so, he does not recollect it.

Plaintiff introduced a memorandum of the transaction between Davis and Rollins, which does not appear to have been made by Rollins, as follows : —

| | | |
|---|---|---|
| "James S. Rollins . . . . . . | | 100 shares. |
| Cash . . . . . . . . . | | $10,450 |
| Paid by collateral 23 . . . . . . . | | 500 |
| | $8,500 | |
| Interest . . . . . . . . . | . 540 | |
| Cash . . . . . . . . | 1,000 " | |
| "A. M. B." | | |

On the back of this is written, " Received from Geo. J. Davis the within, in full settlement of one hundred shares of St. Louis Life stock sold him December 10, 1875. A. M. Britton."

This is dated the day of the check. It was shown that Davis wrote to Rollins at Columbia to send the stock to him, or to some person in St. Louis, for Rollins. This is all the testimony as to that matter ; and it is not enough, we think, to affect Rollins with notice of what Britton knew about the transaction.

2. Appellant contends that the stock notes of Rollins were non-negotiable ; that Davis was not an innocent purchaser for value, and that Rollins was bound to inquire how Davis got possession of his stock notes. The notes of Rollins were negotiable in form. It was held by the circuit court of the United States for the eastern district of Arkansas, in a similar case arising out of the very same transaction here in litigation (*Alexander* v. *Homer*, 11 C. L. J. 111), that insurance companies have the power to take and hold negotiable paper and other securities in the general conduct of their business, and that this includes the power to negotiate them ; and that, even if Davis obtained the note of a stockholder by fraud, as stock notes, such as the one in suit are negotiable, the maker is discharged from liability to the payee if he paid the note to the fraudulent holder without notice of the fraud ; and that the discharge extends to the original consideration. Appellant contends, however, that that decision ought not be regarded as in point, for the reason that it does not appear that Judge Caldwell, by whom it was delivered, had before him the Missouri statute. The statute in question (Wag. Stats., p. 744, sects. 19, 20), so far as we can see, says nothing which directly or indirectly, tends to impair the negotiability of a note given for stock in a mutual company. On the contrary the power to accept such paper involves the power to utilize it. We think with the learned judge of the circuit

court who tried this cause, and with the learned judge who delivered the decision of the Federal court in the similar case just cited, that there was nothing in the fact that the note was given for his stock, to put Rollins upon any particular inquiry about the matter, or to affect him with notice that Davis acquired the note by breach of trust. In *Stillwell* v. *Craig* (58 Mo. 24), there is a *quære* as to whether a corporation can make a valid transfer of a promissory note expressed to be for ten shares of its capital stock payable in installments not to exceed ten per cent on each share, at thirty days' notice of call, when such a note is held as part of a trust fund representing the capital stock of the corporation. But the question was not before the court, and is not answered. The case is no authority for the view of appellant. Nor do we see why it must be held, that because the assets of a corporation are a trust fund for its creditors, the corporation, when solvent, can not through its directory and proper agents, use and transfer its assets. We think that it may do so, and must have such power, unless it is to be injuriously hampered. Except so far as restrained by statute, a corporation, generally speaking, may deal with its property as an individual may.

A balance on the smaller note was, however, overdue. But, as between Davis and the corporation, the title of Davis was perfect. This might have enabled the corporation to recover on the note from Rollins, if Davis had stolen the note and had been paid by Rollins as legal holder for value, when he was not so. It is creditors of the corporation, through its receiver, who claim that Rollins knew that this asset of the corporation was transfered to Davis in fraud of their rights; and, to recover a second time from Rollins, they must show that such was the nature of the transaction between Davis and the corporation, and that Rollins knew it, or was bound to know it, and would have known it if he had done his duty.

What duty had Rollins in the premises? He held stock

which he could have sold in the stock market for par.  He sells it to a former director, who offers him for it its market value, part in cash, part in negotiable notes which Rollins had given with collateral bonds to the company in part payment when he bought the stock.  It is not pretended that Rollins, in Columbia, had any actual notice of what the directors of the mutual company of which he was a member were doing in St. Louis.  But let it be conceded that he had constructive notice of the proceedings of the board, so far as they are matters of record, we do not see that that would entitle plaintiff to recover.  The record could disclose nothing to him as to the fraudulent intent that the draft should not be paid, that the Columbia was to be rendered insolvent, that its stock would be fraudulently retired. The Life Association had power to buy, and the Columbia had power to sell.  On its face the transaction was honest enough ; it was perhaps a cover for an ingenious plot by which the conspirators were to be enriched at the cost of the unhappy persons for whom they were trustees ; but these conspirators, on any theory, covered themselves with a mask of honesty, and the stockholders are not supposed to have seen behind the mask.  This mask was the very record entries which are now invoked as giving notice of the fraud to every stockholder dealing with Davis.  But we can not see that any records to which the stockholders had access gave any such notice.

We can not hold, either, that an insurance corporation, as such, can not dispose of its negotiable assets, or that the stockholder of such a company, if he sells his stock for its fair price, to one who offers him in part payment of it the negotiable securities which the stockholder had formerly given to the company, is bound to inquire how and where the purchaser obtained those securities, or is affected with notice of a secret conspiracy between this purchaser and the directory to wreck the company for their benefit.

We think the judgment should be affirmed.  It is so ordered.  All the judges concur.